IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAURIE MICHELLE PETERSON, | ) | CASE NO.  1:23-CV-01831-CAB |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Laurie Michelle Peterson ("Plaintiff" or "Peterson"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In May 2021, Peterson filed an application for DIB and SSI, alleging a disability onset date of January 5, 2020 and claiming she was disabled due to borderline personality disorder, high blood pressure, nerve damage, and distorted vision. (Transcript ("Tr.") at 75, 212-281.)  The applications were denied

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

initially and upon reconsideration, and Peterson requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 145.)

On September 14, 2022, an ALJ held a hearing, during which Peterson, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 38-67.)  On October 21, 2022, the ALJ issued a written decision finding Peterson was not disabled. (*Id*. at 17-31.) The ALJ's decision became final on July 24, 2023, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On September 21, 2023, Peterson filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.) The parties have completed briefing in this case.  (Doc. Nos. 6, 8, and 9.) Peterson asserts the following assignments of error:

> (1)     The ALJ erred when she improperly assessed the opinions of the treating and examining sources and failed to support her conclusions with substantial evidence.

> (2)     The ALJ erred at Steps Four and Five of the Sequential Evaluation when the RFC failed to include the totality of Plaintiff's limitations related to her impairments.

(Doc. No. 6.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Peterson was born in 1982 and was 37 years-old at the time of her administrative hearing (Tr. at 29), making her a "younger individual" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high-school education with some college.  (Tr. at 48.)  She has past relevant work as a food salesclerk, telephone sales representative, extraction machine operator and administrative clerk.  (*Id*. at 29.)

2

**B.**     **Relevant Medical Evidence[2]**

    **i.**     **Relevant Physical Evidence**

Prior to Peterson's January 2020 alleged disability onset date, she went to the emergency room in September 2019 where she was diagnosed with hypertension. (*Id*. at 319.) During an October 2019 visit at the Retina Institute of Virginia, Peterson was assessed for hypertensive retinopathy, papilledema associated with retina disorder, retinal hemorrhage, cotton wool spots, and systemic hypertension by Ophthalmologist Juan Astruc, M.D., where he noted her symptoms had improved after starting on hypertensive medication. (*Id.* at 356, 361.) Peterson was later evaluated that month by Duke Health after complaining of distorted vision. (*Id*. at 366.) While her hypertensive retinopathy was listed as "severe," it was improving, and she was encouraged to continue her blood pressure management and follow up care. (*Id*.) Her hypertension continued to remain "under good control" during unrelated audiology examinations in March 2020 and August, 2020. (*Id.* at 399, 406.)

After Peterson relocated to Ohio, she established primary care with Dr. Nicholas Detore, M.D. in September 2020. (*Id*. at 476.) She reported feeling depressed and hopeless, difficulty sleeping, low energy, poor appetite, feeling bad about herself, feeling that she has let herself or her family down, some suicidal ideations, and trouble concentrating. (*Id*.) She reported visual defects in her left eye, but it didn't affect her from a functional standpoint. (*Id*. at 477.) She further exhibited normal range of motion and full motor strength. (*Id*.) Dr. Detore assessed her for bipolar disorder, retinal infarction, hypertension and a skin lesion. (*Id*. at 478.) She was referred to Crossroads for psychological care. (*Id*.) During a follow up visit in December 2020, Peterson reported becoming established at Crossroads and a desire to become pregnant, so a discussion about adjusting her blood pressure medication ensued, but she otherwise appeared

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

unremarkable. (*Id*. at 473.) During another follow up visit in March 2021, Peterson denied any new concerns and Dr. Detore opined she may need to add another medication to manage her hypertension but that she was to discuss it with her gynecologist. (*Id*. at 469-471.)

In August 2021, Peterson underwent a vision consultative examination with Dr. Annalisa Schloss, O.D. (*Id*. at 553-558.) She reported difficulty reading for extended periods of time and not being able to drive for long periods of time. (*Id*.) Dr. Schloss diagnosed her with hypertensive retinopathy in her left eye, astigmatism, hypermetropia, and myopia. (*Id*. at 555.) Dr. Schloss opined that Peterson could drive a car and read but should not work at heights due to her side vision loss and should not work in hazardous situations. (*Id*.)

In September 2021, Peterson reported to Dr. Detore that she was pregnant. (*Id*. at 577.) She claimed to be compliant with closely monitoring her medications and continuing with her psychological treatment. (*Id*.) Dr. Detore referred her to neurologist Dr. Hallie Kendis, due to reported paresthesia of her left arm. (*Id*. at 578.) During a December 2021 exam with Dr. Kendis, Peterson reported ongoing numbness and tingling in her left arm and fingers. (*Id*. at 731.) She indicated she did not feel down, depressed, or hopeless. (*Id*.) She was diagnosed with cervical radiculopathy and left arm weakness. (*Id*. at 732.) Because her symptoms had not worsened over the past several months, she was advised to wait until she delivered her child to seek further treatment. (*Id*. at 732.)

Peterson reported mildly improving symptoms and that she was "doing well" during a January 2022 visit with Dr. Kendis. (Id. at *1061*.) She reported no back or neck pain, no problems performing daily bathing, toileting, or cooking activities, no problems driving, dressing, taking medication, cleaning, shopping, or utilizing the phone. (*Id*. at 1061-1062.) An MRI revealed bulging discs and foraminal stenosis at C3-4, C5-6, C6-7, C7-T1, foraminal stenosis at C4-5, a slight bulge at T2-3, foraminal stenosis with crowding of the left C8 nerve root and straightening of the lordotic curve. (*Id*. at 1058-1060.) There was

further evidence of a subacute to chronic left C8 radiculopathy. (*Id*. at 1063.) Intervention options such as physical therapy were discussed. (*Id*. at 1061.) In a May 2022 opinion, Dr. Detore opined that Peterson exhibited improved symptoms with psychiatric medication, but otherwise appeared tearful and unable to manage stress. (*Id*. at 935.) Her prognosis was listed as "fair." (*Id*.) He stated Peterson could lift and carry 20 pounds occasionally and 10 pound frequently; could sit, stand, and walk for four to eight hours; would be off-task for 25% or more of the day; and was incapable of "low stress" work. (*Id*. at 936-938.)

In June 2022, Peterson met with Dr. Patrick Tessman, M.D. (*Id*. at 1067.) While physical therapy was helping neck and left upper extremity pain, she was now experiencing numbness and tingling in her right hand. (*Id*.) Her left upper extremity appeared unremarkable and her left cervical radiculopathy appeared stable, but her right upper extremity showed decreased sensation to pin light temperature in the right median nerve distribution. (*Id*.) Dr. Tessman opined she had carpal tunnel syndrome and suggested she wear wrist splints and continue physical therapy. (*Id*. at 1068.)

In June 2022, Peterson sought treatment for mild blurred vision which yielded a diagnosis of central retinal vein occlusion with macular edema, choroidal nevus, hypertensive retinopathy, and epiretinal membrane. (*Id*. at 1069-1070.)  During a follow up visit in August 2022, she again reported mild blurred vision but that it had remained stable since her last visit. (*Id*. at 1227.)

### ii.    Relevant Mental Evidence

Peterson began undergoing mental health treatment at Crossroads beginning in December 2020. (*Id*. at 486). She reported having "a series of meltdowns" and did not feel in control. (*Id*.) She described having "multiple personalities." (*Id*.) She denied any eating or sleeping limitations and claimed she could perform activities of daily living independently. (*Id*.) At the time, Peterson and her fiancé were running their own music label company. (*Id*.) She exhibited mania/hypomania symptoms, mood disturbances, and depression, but otherwise appeared age appropriate, cooperative, and exhibited appropriate approaches to her

assessment. (*Id*. at 492-496). She expressed a "short fuse" when she could not communicate what she felt she needed to and suffered from extreme self-loathing. (*Id*. at 488.) She further expressed fluctuating weight gain and loss, sleep disturbances, poor concentration, and feelings of agitation. (*Id*. at 498.) She indicated she would hear her own inner voice and it would "take over her entire personality" whereas she would lose track of time. (*Id*. at 502.) She stated she would have periodic suicidal ideations and experienced mood fluctuations. (*Id*.) She indicated difficulty controlling her anger and fear of being abandoned, but otherwise denied manic symptoms, PTSD symptoms, and panic attacks. (*Id*. at 502.) She otherwise appeared alert and attentive. (*Id*. at 503.) She was diagnosed with borderline personality disorder, stimulant use disorder (in remission), mild cannabis use disorder, and alcohol use disorder (in remission). (*Id*. at 504-506.) During a January 2021 therapy session, she reported a more stable mood and decrease in irritability, but still experienced feelings of worthlessness. (*Id.* at 511.) She otherwise appeared alert, fully oriented, attentive, and demonstrative a normal rate of speech and mood and indicated she was looking for a job. (*Id*.) In February 2021, Peterson continued to struggle with feelings of worthlessness but noted more stability in her mood and less irritability. (*Id.* at 520.) She experienced increased episodes of anxiety but attended the gym and made noise tapes and utilized other coping skills to work through them. (*Id*.) She otherwise appeared alert and oriented, attentive, and with a logical and linear thought process. (Id. at 521.)

Peterson began therapy sessions with Elizabeth McDermott at the Behavioral Wellness Group in September 2021. (*Id*. at 566.) She reported having a difficult time managing negative thoughts but was optimistic about beginning routine therapy. (*Id.* at 566.)

She completed an Adult Clinical Interview with Dr. Natalie M. Whitlow, Ph.D, related to her disability claim. (*Id.* at 581.) During that interview, she reported her vision kept her from working because it slowed her down, and her borderline personality disorder made it difficult for her to work with superiors, she was quickly annoyed by others due to what she perceived as ignorance, and she had a low tolerance for

stupidity. (*Id.* at 582.) She reported she was medicated for her blood pressure, but "as far as work, it's an anger/rage type of thing, a panic thing, and difficulty breathing." (*Id.*) She also said her neuropathy prevented her from typing or cutting or doing fine movements efficiently. (*Id.*) She reported disrupted sleeping patterns and eating patterns and that she struggled to regularly attend to household chores due to her depression and pain. (*Id.* at 585.) She further said she could manage her finances. (*Id.*) Dr. Whitlow referred to Peterson as eccentric, argumentative, and condescending at times, while engaging in dramatic behaviors, but was otherwise alert, coherent, and attentive. (*Id.* at 586.) Her mood was described as labile, emotionally fragile, and inappropriate. (*Id.*) She possessed average cognitive functioning and insight, but poor judgment. (*Id.* at 586-587.) Dr. Whitlow noted the following,

> [T]he claimant's mental health prognosis is poor and is rated as such because of the characterological nature of her diagnosis and the accompanying stability, endurance, and unchanging nature of the symptoms of this diagnosis, as well as the level of severity of her reported symptoms, the longevity of her symptoms with an increase in the frequency, intensity, and severity of her symptoms and no increase in her ability to effectively manage her symptoms, the significant mental health signs that she presented with, during this evaluation, and her symptom's seeming lack of appropriate responsiveness to psychotropic medication and psychological intervention.
>
> The claimant's affect was labile, emotionally fragile, and inappropriate, during the clinical interview, her presentation and interpersonal style was eccentric, brash, and unpleasant to interact with, and her thought processing and communication style was assessed to be within normative ranges.
>
> From a mental health perspective, the claimant does not appear to have limitations with understanding or remembering instructions. The claimant appears to have limitations with carrying out instructions, which is evidenced by both her BPD and GAD with Panic Features diagnoses because they have accompanying symptoms that cause her to become argumentative, combative, defiant, and insubordinate towards superiors and authority figures and to experience extreme feelings of being overwhelmed that causes her to shut down and become immobile and non-productive. The claimant appears to have limitations on this functional assessment area [maintaining attention and concentration, and in maintain persistence and pace to perform simple tasks and to perform multi-step tasks], which is evidenced by both her BPD and GAD with Panic Features diagnoses because they have accompanying symptoms that cause her to become easily

7

> overwhelmed and to experience racing thoughts and the sensation as if she is being run by a motor, which diminishes her functioning on each of the domains of this functional assessment area. The claimant appears to have limitations on this functional assessment area [abilities and limitations in responding appropriately to supervision and to coworkers in a work setting], which is evidenced primarily by her BPD diagnosis that has accompanying symptoms that cause her to have an unpleasant interpersonal style, to be argumentative, combative, and noncompliant toward authority figures, to be overly critical of others, to lack typical levels of patience for typical social stressors, to be impulsive, to display intense and inappropriate anger and aggression, to have an irritable and reactive mood, and to maintain intense interpersonal interactions with others, all of which diminishes her functioning on this domain. The claimant appears to have limitations on this functional assessment area [abilities and limitations in responding appropriately to work pressures in a work setting], which is evidenced by both her BPD and GAD with Panic Features diagnoses that have accompanying symptoms that interfere with her regular and responsible attendance, her emotional stability and ability to present and interact in an appropriate and professional manner, her rational thinking and general thought processing, her ability to maintain focus, and her performance and productivity, all necessary components for responding appropriately to work pressures.

(*Id.* at 587-590.)

In her review of Peterson, Dr. McDermott also noted Peterson was unable to perform any work due to panic attacks, excessive worry about panic attacks, difficulties maintaining concentration, and performing activities of daily living. (*Id.* at 710.)

During Peterson's weekly therapy sessions, she reported feelings of depression, restlessness, fatigue, increased appetite, worries that are difficult to control, irritability, difficulty concentrating, as well as periodic suicidal ideations. (*Id.* at 613-614.) She practiced coping skills to aid in her management of anxiety and communication, as well as how to build trust towards men. (*Id.* at 657.) Breathing and grounding techniques were especially helpful during panic attacks. (*Id.* at 658.) In subsequent sessions, she continued to work on coping skills and would report to have a "good" or "great" week. (*Id.* at 659, 672, 675, 714). She expressed looking forward to hosting holiday events at her house, and cooking, cleaning, and decorating for parties. (*Id.* at 675.) She was planning to visit her parents in Florida and felt less anxious about the trip due

8

to her therapy and communication with her mother. (*Id*.) During the trip, she was able to utilize grounding techniques when needed. (*Id*. at 675, 721) She felt that therapy was helping, and she was feeling empowered. (*Id.* at 749.) She noted her depression and anxiety fluctuated, but she felt she was making progress. (*Id*.) She expressed a motivation to continue treatment and understood the need to gain healthy coping skills to manage symptoms of anxiety and depression. (*Id*. at 762.) In subsequent therapy sessions, she reported being able to stay calm under pressure and going to the grocery store with her child. (*Id*. at 784.) She further reported several opportunities where she could get frustrated but pushed through and "rode the wave of distress." (*Id*. at 808.) Peterson reported overall improved symptoms and, in several sessions, discussed the utilization of coping skills learned through her therapy. (*Id*. at 793, 800, 808, 816, 820, 854, 885.)

Also in May 2022, McDermott evaluated Peterson in a mental impairment questionnaire. (*Id*. at 1052.) McDermott opined that Peterson would continue to struggle with her mental health for the rest of her life with varying degrees of severity. (*Id*.) She indicated Peterson's impairments or treatments would cause her to be absent from work seven days per week, and her symptoms would cause her to be off task 100% of the day. (*Id*. at 1053.)

## C.    State Agency Reports

### 1.    Mental Impairments

In October 2021, state agency reviewing psychologist Karla Delcour, Ph.D., evaluated Peterson's mental limitations and determined Peterson to be moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them. (*Id*.) She was moderately limited in her capability to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id*.) Peterson could engage in minimal superficial interactions with coworkers, supervisors, and

the public. (*Id*.) Further, Peterson was found to have a moderately limited ability to respond appropriately to changes in the work setting but retained the ability to perform duties that are routine and predictable. (*Id*. at 84.) These findings were affirmed upon reconsideration. (*Id*. at 107.)

### 2. Physical Impairments

In September 2021, state agency reviewing physician Lynne Torello, M.D., reviewed the available medical evidence and determined Peterson could occasionally lift and/or carry up to 20 pounds and could frequently lift and/or carry up to 10 pounds. (*Id*. at 81.) She was unlimited in her ability to push and/or pull in her upper extremities, other than shown for lift and/or carry. (*Id*.) Dr. Torello found Peterson could stand and/or walk with normal breaks for about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (*Id*.) Due to her hypertensive retinopathy, Peterson was given limitations of never climbing ladders, ropes, or scaffolds, and occasionally climbing ramps and/or stairs. (*Id*.) Dr. Torello opined that due to limited near and far visual acuity and depth perception in the left eye and limited field of vision in both eyes, Peterson should avoid unprotected heights, dangerous machinery, commercial driving, and all exposure to hazards. (*Id*. at 82.) Dr. Torello noted Peterson walked carefully and had to look down at the floor to make sure she did not trip or fall. (*Id*.)

Upon reconsideration in January 2022, state agency reviewing physician Mehr Siddiqui, M.D., affirmed all findings from the initial review but determined Peterson had further limitations in her handling and fingering manipulation due to cervical radiculopathy causing upper extremity weakness on her left side. (*Id*. at 104-106.)

### D. Hearing Testimony

During the September 2022 hearing, Peterson testified to the following:

- Medical Impairments: She stretches and mediates daily while taking care of her child. Lifting her daughter becomes difficult. Her spinal injury and difficulty gripping make it hard to get dressed and bathe independently sometimes. She attends physical therapy, which is helping. She reports

being scared of being murdered and of being judged. She has panic attacks a few times per week and is in weekly therapy for mental health treatment, which helps. She considering going back to intensive outpatient therapy which is nine hours per week. She cannot see out of the lower left portion of her eye. Her blood pressure rises causing her retinas to swell.

- Daily Living: Peterson lives with her husband and infant daughter. She has anxiety when driving and limits herself to driving to the grocery store or pharmacy. She used to have panic attacks at work. She must pace herself in order to survive and has to take several breaks during the day. She has difficulty lifting her daughter. She can help around the house such as sweeping, taking laundry downstairs, or getting trash together, but has trouble bathing and getting dressed on some days. She feels anxious due to being stalked in the past and fear of her child getting hurt, and is scared of explosions, guns, car accidents, war, and of bad interactions with strangers. She cannot keep focus for long.

(Tr. at 47-62.)

The VE testified Peterson had past work as an extraction machine operator, administrative clerk, food salesclerk, telephone sales representative, delivery route driver, and server/dishwasher. (*Id*. at 62-63.) The ALJ then posed the following hypothetical question:

Please assume a hypothetical individual of the same age and education as the claimant and with the past jobs that you described who could perform work at the light exertional level, never climbing ladders, ropes, or scaffolds, occasionally climbing ramps and stairs, occasional balancing, frequent stooping, kneeling, crouching, and crawling, frequent near and far acuity in the left eye, cannot perform work requiring precise depth perception like threading a needle or repairing a watch, could perform frequent handling and fingering with the non-dominant left upper extremity, must avoid unprotected heights, dangerous machinery, and commercial driving, can understand, remember, and carry out simple instructions and routine, repetitive tasks, cannot perform work requiring a specific production rate such as assembly line work, can meet production requirements that allow flexible and goal-oriented pace, can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments for eight-hour workdays within the confines of normal work breaks and lunch periods, can deal with changes in a routine work setting, but changes need to be explained in advance, could tolerate occasional interaction with supervisors, coworkers, and the general public, but contacts still includes what is necessary for general instruction of task completion or training, could not perform tandem tasks, cannot engage in work involving arbitration, negotiation, conflict resolution, management, or

> supervision of others, or responsibility for the health, safety, or welfare of others. Could this individual perform the claimant's past work?

(*Id.* at 64.)

The VE testified the hypothetical would not be able to perform Peterson's past work. (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as garment sorter, hospital products assembler, and stock checker. (*Id.* at 65.)

Peterson's counsel then questioned the VE. (*Id.* at 66-67.) The VE was asked if her response would be impacted if the previously identified hypothetical individual was only capable of reaching occasionally with the left upper extremity in all directions. (*Id.* at 66.) She testified that would eliminate the jobs previously mentioned, and there would be no other work. (*Id.*) Counsel then asked if the VE's response would change if the first hypothetical hypothetical individual were to be limited to minimal interaction with coworkers, supervisors, and the public. (*Id.*) The VE testified that would also eliminate any work previously mentioned and the VE was unable to identify any other work. (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d

504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Peterson was insured on the alleged disability onset date, January 5, 2020, and remains insured through December 31, 2024, the date last insured ("DLI"). (Tr. at 22.) Therefore, to be entitled to DIB, Peterson must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.      The claimant has not engaged in substantial gainful activity since January 5, 2020, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).[3]

3.      The claimant has the following severe impairments: obesity, hypertension, central retinal vein occlusion with macular edema, hypertensive retinopathy, depression, borderline personality disorder, generalized anxiety disorder, cervical degenerative disc disease with radiculopathy, and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.)

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant may never climb ladders, ropes, or scaffolds, but may occasionally climb ramps or stairs. The claimant may occasionally balance but frequently stoop, kneel, crouch, and crawl. The claimant may use frequent near and far acuity in the left eye but cannot perform work requiring precise depth perception like threading a needle or repairing a watch. The claimant may frequently handle and finger with the non-dominant left upper extremity. The claimant must avoid unprotected heights, dangerous machinery, and commercial driving. The claimant can understand, remember, and carry out simple instructions and routine repetitive tasks; cannot perform work requiring a specific production rate, such as assembly-line work; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can deal with changes in a routine work setting, but changes need to be explained in advance; could tolerate occasional interaction with supervisors, coworkers, and the general public, but contact still includes what is necessary for general instruction, task completion, or training; cannot perform tandem tasks; and cannot engage in work involving arbitration, negotiation, conflict resolution, management or supervision of others, or responsibility for the health, safety, or welfare of others.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

---

[3] The ALJ noted the claimant worked after the alleged disability onset date, but the work activity failed to rise to the level of substantial gainful activity as the claimant's income the first quarter of 2021 was under $300. (Tr. at 22-23.)

7.    The claimant was born on May **, 1982 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 5, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 22-31.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by

substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error: The ALJ erred when she improperly assessed the opinions of the treating and examining sources and failed to support her conclusions with substantial evidence.

In her first assignment of error, Peterson alleges the ALJ erred when she improperly assessed the opinions of the treating and examining sources and failed to support her conclusions with substantial evidence, specifically regarding the evaluations by Dr. Nicholas Detore, the Behavioral Wellness Group, Dr. Natalie Whitlow, Dr. Annalisa Schloss, and the State Agency Reviewers. (Doc. No. 6.) She asserts the ALJ erred when failing to find the physical limitations opined by Dr. Detore were supported by and consistent with other medical evidence. (*Id*. at 11.) She maintains the ALJ focused on specific aspects rather than the entirety of the medical examination results regarding imaging of her spine. (*Id*. at 12.) Peterson further affirms the examinations conducted by the Behavioral Wellness Group are backed by thorough treatment records. (*Id.* at 14.) She alleges the ALJ emphasized the absence of specific symptoms in conjunction with her capacity to accomplish daily activities. (*Id*.) The ALJ's evaluation of Dr. Whitlow's assessment noted Peterson's absence of specific symptoms and deemed it unpersuasive despite acknowledging consistent limitations. (*Id.* at 17.) Dr. Schloss's evaluation indicated Peterson's ability to drive a car, but highlighted difficulties with prolonged reading and restricted work at heights or in hazardous situations. (*Id*. at 18.) Peterson contends Schloss's findings align with previous findings from the Retina Institute of Virginia, yet the ALJ concentrated on the full vision in her right eye rather considering than the blurry vision and peripheral vision loss in both eyes. (*Id*.)

Peterson further alleges the ALJ's determination regarding the persuasiveness of the state agency reviewers' reports was erroneous. (*Id.*) These opinions were rendered before submission of some of the evidence in this case, and they do not reflect the latest medical evidence indicating the deterioration of Peterson's cervical radiculopathy and vision. (*Id.* at 18-19.)

The Commissioner contends the ALJ's decision to find Dr. Detore's medical opinion unpersuasive was justified, citing the checkbox form and absence of supporting explanations. (Doc. No. 8 at 12.) Furthermore, the ALJ highlighted evidence in the record indicating improvement in Peterson's mental health with treatment. (*Id.* at 13.) Regarding Peterson's cervical spine MRI results from January 2022 as well as the stability of her radiculopathy, the Commissioner maintains the ALJ specifically addressed these points. (*Id.* at 14.) Concerning Dr. McDermott and the Behavioral Wellness Group, the Commissioner emphasized the ALJ's observations of inconsistencies between McDermott's opinion and Peterson's demonstrated abilities in activities such as driving, shopping, managing finances, cooking, and cleaning. (*Id.* at 15.) The Commissioner pointed out disparities between McDermott's restrictive assessment and Peterson's reported ability to travel out of state, host parties, and go on outings, suggesting incongruences. (*Id.*)

Similar inconsistences were noted by the ALJ regarding Dr. Whitlow's opinion, according to the Commissioner, particularly considering Peterson's reported improvement with therapy. (*Id.* at 17.) The Commissioner also alleges the absence of a clear functional limitation in Dr. Whitlow's opinion reduces its overall usefulness. (*Id.*)

The Commissioner argues Dr. Schloss's assessment of Peterson's visual abilities align with the ALJ's determination that she should avoid working at heights or in hazardous conditions. (*Id.* at 18.) Despite her opinion being "somewhat consistent" with other evidence of a decreased visual field in the left eye, the Commissioner asserts the ALJ adequately accommodated this limitation in his RFC findings. (*Id.*) The ALJ

also noted discrepancies between Dr. Schloss's opinion on Peterson's driving capabilities and her subjective complaints of blurry vision, yet these were still factored into the RFC findings. (*Id*.)

Furthermore, the Commissioner asserts the ALJ appropriately assessed the opinions of the state agency reviewing physicians, which included the treatment records of Peterson's radiculopathy. (*Id*. at 19.) Reviewing the case before the record's completion is standard practice, according to the Commissioner, making Peterson's objection unfounded. (*Id.* at 20.)

In her reply, Peterson maintains the ALJ did not completely cite to the objective medical testing. (Doc. No. 9 at 1.) She asserts the ALJ discounted her MRI results by noting her radiculopathy was stable and failing to note her paresthesia in her upper left extremity and numbness and tingling in her right hand. (Id. *at* 2.)

Since Peterson's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent

with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### i.    Dr. Nicholas Detore

The ALJ analyzed and weighed Dr. Detore's opinion as follows:

> The undersigned finds the opinion of Dr. Detore unpersuasive. This doctor limits the claimant to sitting, standing, or walking for four hours, lifting no more than 20 pounds, off task 25% of the time, and would be incapable of even low stress work (Exhibit 26F). This opinion was completed on a checkbox form with minimal supporting explanation for the assigned limitations. Further, the inability to perform even low stress work is not consistent with the claimant's ability to drive a car, do her own shopping, manage finances, cook, and perform household cleaning (Exhibit 9E/3-4). The claimant also showed improvement with mental health treatment. Therefore, this opinion is not persuasive.

(Tr. at 28.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ considered the supportability and consistency of Dr. Detore's opinion, highlighting contradictions between Peterson's capabilities in daily tasks like driving, shopping, and cooking, and her inability to perform "even low stress

work." (Tr. at 28, 305-306.) He also pointed out discrepancies with reports indicating Peterson's improved mental well-being. (*Id.* at 28.)

Peterson contends the ALJ neglected to acknowledge the physical limitations outlined by Dr. Detore were corroborated and supported by other medical records. (Doc. No. 6 at 11.) The Court finds the ALJ appropriately highlighted Peterson's significant radiculopathy at Step Two and considered her moderate foraminal stenosis and thoracic disc bulge.  (Tr. at 26, 321, 478, 1068.) The ALJ compared Peterson's ability to perform daily activities with her physical restrictions and found them to be inconsistent. (*Id*. at 28.) (*see Hauge v. Commr. of Social Sec.*, 2022 WL 965027, *9, where the court found the ALJ adequately explained her reasoning regarding the inconsistency between the claimant's daily activities and other medical records in her analysis of why a medical opinion lacked persuasiveness; *Sterner v. Commr. of Social Sec.*, 2022 WL 684567, *3, report and recommendation adopted, 2022 WL 678647; "[T]he ALJ need not repeat the discussion of . . . inconsistent activities of daily living in his persuasiveness assessment for the Court to consider them substantial evidence in support of the ALJ's assessment of the opinion."

Substantial evidence supports the ALJ's determination regarding the unpersuasiveness of Dr. Detore's opinion. "Even if substantial evidence would also support the opposite conclusion, the Court may not reweigh the evidence and substitute its own judgment for that of the ALJ." *See Hatmaker v. Comm'r of Soc. Sec.*, 965 F. Supp. 2d 917, 930 (E.D. Tenn. 2013); *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 670 (6th Cir. 2009) (the ALJ, not the reviewing court, must resolve conflicts in evidence); *Terry v. Saul*, No. 20-CV-1133-TMO, 2021 WL 2222738, at *6 (W.D. Tenn. June 2, 2021). The Court finds no reason to disturb the ALJ's decision.

### ii.    Behavioral Wellness Group

The ALJ analyzed and weighed Dr. McDermott's opinion as follows:

> The undersigned finds the opinion of Elizabeth McDermott unpersuasive. She opines that the claimant would be absent from work seven days per week and would be off task for 100% of the day (Exhibit 28F). This opinion

was completed on a checkbox form with minimal supporting explanation for the assigned limitations. Further, the inability to be on task for even 1% of the day is not consistent with the claimant's ability to drive a car, do her own shopping, manage finances, cook, and perform household cleaning (Exhibit 9E/3-4). She also participated in therapy, which improved her symptoms. Therefore, this opinion is not persuasive.

The undersigned acknowledges the statements from the Behavioral Wellness Group stating that the claimant is unable to perform work activity (Exhibit 14F/23, 20F/12). First, the statemen that the claimant cannot perform any work activity is an administrative finding reserved to the Commissioner. Second, this statement is unsigned, so it is unclear whether this was offered by a medical provider. Third, to the extent this implies that the claimant cannot perform any work-like functions, it is inconsistent with the claimant's ability to drive a car, do her own shopping, manage finances, cook, and perform household cleaning (Exhibit 9E/3-4). Therefore, the persuasiveness of this statement has not been formally assessed.

(Tr. at 28-29.)

Peterson argues McDermott's assessment aligns with other treatment records. (Doc. No. 6 at 14.) She reported experiencing several meltdowns and feelings as if she had multiple personalities. (Tr. at 486.) She exhibited symptoms of elevated or irritable mood, decreased need for sleep, distractibility, inflated self-esteem, increased talkativeness, racing thoughts, and signs of depression, fatigue, feelings of worthlessness, diminished cognitive abilities, and recurrent suicidal thoughts. (*Id.* at 492.) However, the ALJ accurately noted discrepancies between McDermott's assessment and the remainder of the record, including Peterson's reported ability to travel out of state, hosting parties and holidays, taking her child on outings, and expressing feelings of improvement and enhanced coping skills during group therapy sessions. (cite) The ALJ also observed McDermott's evaluation contradicted Peterson's examination results indicating good concentration, memory, knowledge, and fair insight, despite lapses in judgment and instances of aggressive behavior.  (*Id.* at 496-497, 587-588, 684-685, 1205.) The Court finds the ALJ did not err in finding McDermott's report unpersuasive.

### iii.    Dr. Whitlow

The ALJ analyzed and weighed Dr. Whitlow's opinion as follows:

> The undersigned finds the opinion of the psychological consultative examiner unpersuasive. She opines that the claimant has limitations in concentrating, social interactions, and adapting to work pressures (Exhibit 12F). This opinion is supported with attached examination findings, such as the claimant's poor judgment (Exhibit 12F/8). This opinion is also reasonably consistent with the claimant's suicidal ideation (Exhibit 34F/7). However, since this opinion does not clearly specify the degree of limitation in these areas, it was not useful in assessing the claimant's residual functional capacity. Additionally, the claimant's inappropriate eye contact, passive aggressive behaviors, and inappropriateness were not consistent with treatment notes (for example, Exhibits 25F and 34F).

(Tr. at 28.)

First, to the extent the ALJ rejected Dr. Whitlow's opinion for lack of a degree of limitation, there is no error. "Vagueness, or the failure to propose specific functional limitations, can be a reason to discount a medical opinion.  *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)." *Springer v. Comm'r of Soc. Sec.*, Case No. 5:19 CV 2562, 2020 WL 9259707, at *9 (N.D. Ohio Oct. 8, 2020), *report and recommendation adopted* by 2021 WL 1015944 (N.D. Ohio Mar. 17, 2021). Dr. Whitlow's opinion lacked a specific degree of limitation. This opinion "lack[s] the specificity required for the ALJ to determine 'the most [Plaintiff] can still do despite [Plaintiff's] limitations'. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Second, the Court agrees with the Commissioner that a fair reading of Dr. Whitlow's opinion conflicts with other evidence in the medical record. Peterson argues the ALJ selectively emphasized specific symptoms during her psychological evaluation with Dr. Whitlow. (Doc. No. 6 at 17.) She asserts the ALJ's decision to identify similar limitations within Dr. Whitlow's assessment while deeming it unpersuasive was flawed. (*Id.*) A review of the record reveals Dr. Whitlow substantiated her opinion with instances of examination findings illustrating Peterson's impaired judgment and suicidal ideations. (Tr. at 587.) However, Dr. Whitlow's evaluation conflicts with other evidence in the record indicating improvements in

24

Peterson's demeanor, cooperative behavior, and reported enhancements in social interactions and coping with societal pressures. (*Id.* at 760-61, 764-65, 769-770, 773-74, 778-79, 782-83, 790-91, 798-99, 806-07, 818-19, 826-27, 834-35, 843-44, 851-52, 861-62, 869-870, 874-75, 879-880, 883-84, 887-88, 891-92, 899-900, 907-08, 915-16, 923-24). Despite this, the ALJ incorporated restrictions into Peterson's RFC finding, such as performing predictable, routine tasks, or adapting to changes in a work setting that are communicated in advance. (*Id.* at 589-590). The Court finds the ALJ did not err in finding Dr. Whitlow's report unpersuasive.

### IV. Dr. Schloss

The ALJ analyzed and weighed Dr. Schloss's opinion as follows:

> The undersigned finds the opinion of the visual consultative examiner persuasive. She opines that the claimant should not work at height or in a hazardous situation but could drive a car (Exhibit 9F). She can read but finds reading for a long time fatiguing. This opinion is supported with attached examination findings, such as decreased visual acuity in the left eye (Exhibit 9F/4). It is somewhat consistent with her decreased visual field in the left eye (Exhibit 3F/3). However, the capacity to drive commercially is not consistent with her reports of blurry vision. The examiner also does not define a "long time," but the undersigned has added a limitation for no more than frequent far and near acuity. Therefore, this opinion is not entirely persuasive.

(Tr. at 28.)

Peterson asserts Dr Schloss's assessment is supported by other evidence in the medical record, including evaluations from the Retina Institute of Virginia and Duke Health, where she underwent assessment for hypertensive retinopathy, papilledema, retinal hemorrhage, cotton wool spots, and systemic hypertension. (Doc. No. 6 at 18.) Despite her condition being stable, she experienced blurred vision and vision loss, corroborated by findings from the Retina Associates of Cleveland. (*Id.*) The ALJ acknowledged Dr. Schloss's opinion, which was backed by examination results indicating decreased visual acuity in the left eye and was "somewhat consistent" with reduced visual field in the left eye. (Tr. at 28.) The ALJ integrated Dr. Schloss's conclusions into the RFC findings, incorporating limitations such as avoiding heights without protection, commercial driving, and jobs requiring precise depth perception. (*Id.* at 25.)

25

However, the ALJ noted an inconsistency between Dr. Schloss's opinion that Peterson could drive and her subjective reports of blurry vision. (*Id.* at 28, 58, 1069, 1227.) The Court finds the ALJ did not err in finding Dr. Schloss's opinion "entirely" persuasive.

### v. State Agency Reviewers

The ALJ analyzed and weighed the state agency reviewer's opinions as follows:

> The undersigned finds the State agency determinations reasonably persuasive. They limit the claimant to light work with limited postural maneuvers, limited visual acuity and depth perception, no exposure to hazards, simple tasks, minimal interactions, and predictable job duties. The reconsideration determinations also include manipulative restrictions with the left upper extremity (Exhibit 2A, 4A, 6A, 8A). These determinations are supported with discussion of the available evidence, such as her cervical radiculopathy and panic attacks (Exhibit 6A/5-6). They are also reasonably consistent with her normal gait and lack of psychiatric hospitalizations. However, the undersigned has rephrased the visual and mental limitations for the sake of clarity.

(Tr. at 28.)

The state agency reviewing physicians provided opinions aligned with the medical record in evidence. They identified restrictions, including limitations to light work, no climbing of ladders, ropes, or scaffolds, no commercial driving, no exposure to heights or dangerous machinery, and frequent handling and finger use on the left side. These assessments are consistent with the documented limitations in Peterson's visual, mental, and physical capacities.

Peterson argues the state agency opinions were proffered prior to the submission of much of the evidence and therefore were not based on the most recent medical evidence demonstrating Peterson's worsening cervical radiculopathy and vision. (Doc. No. 6 at 18.) The Sixth Circuit has held "absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Kelly v. Commr. of Social Sec.*, 314 Fed.Appx. 827, 831; (see also *Harper v. Commr. of Social Sec.*, 2017 WL 224510 at *3, citing to *Courter v. Comm'r of Soc. Sec.*, 479 Fed.Appx. 713, 723 (6th Cir. 2012) (holding the ALJ did not violate SSR 96–6p by not expressly

26

addressing whether a new expert opinion was necessary after new evidence was submitted, and by implicitly concluding the new evidence would not alter the opinions of the experts.) The ALJ may rely upon the opinion of a state agency physician, even if additional evidence post-dates that opinion. *Laquana Patterson on behalf of L.P., v. Commr. of Social Sec.*, N.D. Ohio No. 1:16 CV 110, 2017 WL 914272, *10. The ALJ can assign weight to state agency opinions even if those opinions were not based on the entire record, provided the ALJ considers any evidence submitted after the state agency opinions were issued. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed.Appx. 26, 32 (6th Cir. 2009); *Ruby v. Colvin*, 2015 WL 1000672, *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion.") In this case, it is clear from the ALJ's decision that she considered the state agency physician's opinions along with subsequent evidence.

In addition, the new evidence of Peterson's worsening cervical radiculopathy and vison do not present a different picture of Peterson's disability. Indeed, her cervical radiculopathy and worsening vision are documented throughout the record by several different physicians. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

To the extent Peterson argues the ALJ erred in failing to discuss the consistency of the above-referenced medical opinions with those of the state agency reviewing physicians, even assuming that constituted error under the Revised Regulations, any such error is harmless. *See Ingram v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-2692, 2022 WL 2237807, at *7 (N.D. Ohio June 22, 2022) ("Once the ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless.") (citing *Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 WL 4951763, at *——, 2021 U.S. Dist. LEXIS

204564, at *30 (N.D. Ohio Oct. 25, 2021); *DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176

(9th Cir. 2009)). "Thus, any shortcoming in the ALJ's compliance with 20 C.F.R. § 404.1520c in this case

provides no basis for remand." *Id.* As this Court has previously stated, "reciting medical evidence does not

show that the ALJ's decision is not supported by substantial evidence. *See Jones*, 336 F.3d at 477 (even if

substantial evidence supports a claimant's position, a court can't overturn the Commissioner's decision if

substantial evidence supports the ALJ's conclusion)." *Garcia v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-

1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted by* 2023

WL 2330893 (N.D. Ohio Mar. 2, 2023).

Supportability and consistency are the most important factors under the new regulations for

evaluating medical source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ considered the

supportability and consistency of the state agency reviewing psychologists' opinions. (Tr. 28-29.) Again,

it is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Peterson would

weigh the evidence differently, it is not for the Court to do so on appeal. Therefore, the Court finds the ALJ

did not err in finding the state agency reviewing physician's persuasive.

**B. Second Assignment of Error: The ALJ erred at Steps Four[6] and Five of the Sequential Evaluation when the RFC failed to include the totality of Plaintiff's limitations related to her impairments.**

In her Second Assignment of Error, Peterson contends the ALJ erred at Step Five of the Sequential

Evaluation by not fully incorporating all her limitations related to her impairments in the RFC. (Doc. No. 6

at 20.) She elaborates that while the ALJ's RFC specifies light work with additional limitations, these

included restrictions do not adequately address her documented limitations and lack substantial evidence to

---

[6] Although Plaintiff alleges the ALJ erred at Steps Four and Five of the Sequential Evaluation, Plaintiff admits that "the ALJ correctly found that Plaintiff was unable to perform any of her past relevant work" which reflects a Step Four argument. (Plaintiff's Brief, p. 20.) Therefore, the Court shall consider Plaintiff's Assignment of Error regarding Step Five of the Sequential Evaluation only.

support them. (*Id.* at 21.) She asserts the ALJ overlooked her blurry vision and instead emphasized the full visual field in her right eye. (*Id.* at 22.)

In response, the Commissioner asserts the ALJ acknowledged Peterson's vision limitations and accommodated them by incorporating restrictions into the RFC, such as frequent near and far acuity in the left eye, prohibiting work requiring depth perception, and avoiding hazards. (Doc. No. 8 at 23.) The Commissioner further highlights the ALJ's reference to Peterson's ability to perform tasks like driving, shopping, cooking, and cleaning. (*Id.*)

Regarding Peterson's physical limitations, the Commissioner maintains while the ALJ recognized her moderate foraminal stenosis and thoracic disc bulge, there was also evidence suggestive of stability and improvement with therapy. The ALJ appropriately considered Dr. Siddiqui's previous administrative medical finding that Peterson was limited to frequent handling and fingering on the left side due to cervical radiculopathy causing left-sided weakness. (Tr. 27-28, 105, 117). The Commissioner asserts the ALJ's analysis and conclusion fall within the "zone of choice" afforded to ALJs. *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("[T]here is a 'zone of choice' within which the Commissioner can act without the fear of court interference.").

The Commissioner further highlights the ALJ factored in Peterson's radiculopathy by restricting her to light work and refers to the pertinent evidence concerning Peterson's paresthesia and subsequent examinations indicating stability in her left upper extremity. (Doc. No. 8 at 22.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the

relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249,

2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In the RFC analysis, the ALJ found as follows:

> ". . . Imaging of her spine has shown moderate foraminal stenosis and a slight thoracic disc bulge (Exhibit 30F/3). An electromyogram has also shown left side cervical radiculopathy (Exhibit 31F/3). However, the claimant has received no cervical spine surgery. She also has not had steroid injections. Instead, she is undergoing physical therapy, which she notes is effective (Exhibit 31F/7). The claimant has not been prescribed narcotic analgesics. Her radiculopathy is also noted to be stable (Exhibit31F/8). The claimant's gait is normal (Exhibit 1F/11, 5F/31). The claimant's strength is noted to be normal (Exhibit 6F/18). The claimant has full range of motion (Exhibit 1F/6). However, she does have some decreased sensation in the upper extremities (Exhibit 31F/7). As for her visual impairment, the claimant does have macular edema, although it is noted to be mild in severity (Exhibit 2F/10). She also has grade IV retinopathy secondary to her hypertension (Exhibit 2F/10). She is seen by an ophthalmologist (Exhibit 3F/3). However, she retains 20/20 vision and a full visual field in the right eye (Exhibit 3F/3). The claimant does wear sunglasses, but not standard glasses (Exhibit 9E/7). She also has not undergone ocular surgery. As for her hypertension, this condition did cause her retinopathy after a hypertensive crisis in September2019 (Exhibit 1F/5). However, her more recent treatment notes reflect blood pressure below 140, which is the diagnostic threshold for hypertension (Exhibit 36F/1). She is not followed by a cardiologist. She denies chest pain or palpitations (Exhibit 6F/14). She also denies frequent headaches (Exhibit 11F/9, 15F/9). The claimant is also obese with a BMI of 37 (Exhibit 31F/7). This condition could exacerbate her other physical impairments. However, she is still able to go to the gym (Exhibit 34F/5). Further, she can shop in stores and drive a car (Exhibit 9E/4). The claimant also cooks for herself, cleans the house, and does laundry (Exhibit 9E/3).

(Tr. at 26.)

As this Court has previously explained:

> An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015). Rather, the ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

*Sharpe v. Comm'r of Soc. Sec.*, Case No. 1:20-CV-023732-PAG, 2022 WL 2610449, at *15 (N.D. Ohio Apr. 1, 2022), *report and recommendation adopted by* 2022 WL 2127960 (N.D. Ohio June 14, 2022). Elsewhere in the opinion, the ALJ found for Peterson's vision impairments and assessed appropriate limitations, but Peterson did not establish any functional limitations related to other diagnosed conditions. *See Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988.) (claimant must demonstrate not just presence of medically-diagnosed impairment but also it's severity and functional impact.)

This Court finds the ALJ adequately considered Peterson's physical limitations. In addition to restricting Peterson to frequent handling and fingering on the left side, the ALJ also addressed her cervical degenerative disc disease with radiculopathy by limiting her to light work, with restrictions on climbing ladders, ropes and scaffolds (Tr. at 25.) The ALJ fully accounted for Peterson's documented limitations and testimony in the RFC, and she has not demonstrated the necessity for further restrictions.

Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). While Peterson would weigh the evidence differently, it is not for the Court to do so on appeal.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


Date: June 25, 2024                                         /s/ Jonathan Greenberg
                                                            Jonathan D. Greenberg
                                                            United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**